IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

TIMOTHY S. JACKSON,

      Plaintiff,

v.                                          Case No. 3:20-cv-00864

MARK ELSWICK (Supervisor);
KATHY SMITH, Job Coordinator;
BRIAN GREENWOOD; and
JENNIFER HENDERSON, DOC;

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATIONS

In December 2020, Plaintiff Timothy S. Jackson ("Jackson"), proceeding *pro se*, initiated this lawsuit, and in April 2021, filed an amended complaint pursuant to 42 U.S.C. § 1983. (ECF No. 54). Pending before the court are Defendants' motions for summary judgment. (ECF Nos. 88, 90). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations ("PF&R") for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

Having thoroughly considered the record and the issues in dispute, the undersigned **FINDS** that the amended complaint should be dismissed for failure to exhaust administrative remedies, as well as for failure to state a compensable claim. Accordingly, the undersigned respectfully **PROPOSES** that the presiding District

Judge confirm and accept the following findings and **RECOMMENDS** that Defendants' motions for summary judgment, (ECF Nos. 88, 90), be **GRANTED;** and Jackson's amended complaint, (ECF No. 54), be **DISMISSED**; and this action be removed from the docket of the Court.

## I.    Relevant Facts and Procedural History

As detailed in the undersigned's previous PF&R in this matter, Jackson seeks redress for a number of alleged constitutional violations that took place during his incarceration. (ECF No. 68). In January 2019, Jackson, while incarcerated at the Charleston Correctional Center and Jail ("CCCJ"), was assigned to work for the West Virginia Department of Highways ("DOH") as part of an inmate road crew. (ECF No. 98-1 at 4). Jackson contends that on June 14, 2019 he was forced to operate a weed eater on a steep, slippery hillside, despite his protests that a previous injury made it unsafe for him to work in such conditions. (*Id*. at 5-6). Jackson alleges that he personally explained to the DOH supervisor, Defendant Mark Elswick ("Elswick"), that he had plates and screws in his ankles and feet and could not work on uneven terrain. (ECF No. 54 at 1; ECF No. 98-1 at 5-6). Notwithstanding this discussion, Jackson was assigned to work on the hillside, where he lost his footing and fell, causing a pin in his left ankle to break. (ECF No. 96 at 1–2).

Jackson did not report for work the following Monday, June 17, 2019, and instead sought medical treatment at the Charleston Area Medical Center ("CAMC"). (ECF Nos. 98-1 at 6). On June 27, 2019, CCCJ employee Defendant Kathy Smith ("Smith") charged Jackson in a Disciplinary Incident Report with a violation of Disciplinary Rule 2.03 for refusal to work, stating that Elswick did not want Jackson to return to work with the DOH because of his "lack of effort and his constant complaints of the work he was asked

to perform." (ECF No. 98-3 at 2). A disciplinary hearing was held before a West Virginia Division of Corrections and Rehabilitation ("DCR") Hearing Officer, Defendant Brian Greenwood ("Greenwood") on July 2, 2019, and Jackson was found guilty of the violation. (ECF No. 88-2 at 1–2). He was punished with a thirty-day loss of privileges and transfer to a more secure facility. (*Id.*).  In a separate disciplinary hearing on a later date, Jackson was found guilty of refusing to provide a urine sample for screening and sentenced to a period of administrative segregation. (ECF No. 95-6; ECF No. 95-7). He was transferred to Huttonsville Correctional Center ("HCC") after his second disciplinary charge. (ECF No. 98-1 at 14–17). Jackson was released on parole from HCC in December 2019. He was subsequently arrested on other unrelated charges and housed at the Western Regional Jail and Correctional Center ("WRJ"). (*Id.* at 12–13).

While incarcerated at the WRJ, Jackson filed the instant lawsuit on December 23, 2020, and filed an amended complaint on April 20, 2021. (ECF Nos. 1, 2, 54). Claims against some of the original defendants have since been dismissed, leaving Defendants Smith, Greenwood, and DCR employee Jennifer Henderson ("Henderson") (collectively referred to as the "DCR Defendants"), and Defendant Elswick from the DOH as defendants. (ECF Nos. 68, 70).

### A.    DCR Defendants' Motion for Summary Judgment

#### *1.    Motion and Memorandum of Law*

On October 15, 2021, the DCR Defendants filed a motion for summary judgment and an accompanying memorandum of law. (ECF Nos. 88, 89). Therein, the DCR Defendants contend that they are not suable "persons" under § 1983 because they were acting as agents of the State when the events giving rise to the suit took place. (ECF No. 89 at 4–5). Next, the DCR Defendants assert that they are entitled to summary judgment

because they are protected from liability by qualified immunity. (*Id.* at 5). They insist that Jackson does not show that they violated any of his statutory or constitutional rights because Jackson fails to present evidence that he was unable to work due to his injury on the hillside, or that he was restricted from working, maintaining that these "allegations are unsubstantiated and are not true." (*Id.* at 6).

The DCR Defendants further assert that Greenwood is afforded judicial immunity in connection with the disciplinary proceedings. (ECF No. 89 at 7). They contend that Jackson's disciplinary proceedings complied with due process and did not violate his rights pursuant to *Wolff v. McDonnell*, 418 U.S. 539 (1974). (*Id.* at 7–10). As to Henderson, the DCR Defendants argue that she did not violate Jackson's rights by preventing him from attending a medical appointment. (*Id.* at 10). According to the DCR Defendants, the record does not establish "what appointment may have been cancelled, when it was cancelled, and by who[m]." (*Id.* at 11). They claim that Jackson does not provide evidence that Henderson was deliberately indifferent to his medical needs as "[i]t is clear that [Jackson] was suffering from no serious medical need which required the immediate seeing of a physician." (*Id.* at 11–12). Finally, the DCR Defendants state that Jackson's claims must be dismissed because he failed to exhaust his administrative remedies. (*Id.* at 12–15).

### 2.    *Jackson's Response*

Jackson responded to the DCR Defendants' motion on November 3, 2021. (ECF No. 95). He states that he went to the CAMC emergency room after an ankle injury sustained during his work with the DOH, and he also had a urinary issue. (*Id.* at 1). He claims that during his visit to the ER, he was "put on light duty until he obtained a follow-up appointment" and he provided documentation of his hospital visit and "light-duty

4

slip" to Smith on June 18, 2019. (*Id.*). He asserts that after Smith spoke with Elswick, she charged him with refusing to work without considering his medical documentation or light-duty slip, or speaking with any witnesses to his accident. (*Id.*). After he was written up for refusing to work, Jackson contends he was subject to a urine screen which he was unable to complete due to a urinary issue identified at his ER visit. (ECF No. 95 at 2).

Jackson disputes that Greenwood is entitled to judicial immunity and claims that his inappropriate decision-making caused Jackson to be placed in administrative segregation. (*Id.*). He claims that during his hearing for the refusal to work charge, he was unable to cross-examine Smith or present testimony from other inmates assigned to the DOH work crew who witnessed his injury. (*Id.*). Jackson argues that Henderson indeed violated his constitutional rights as she told "Officer Dean" not to allow Jackson to go to the ER despite her knowledge of ER medical staff's instructions for Jackson to return if his foot became swollen. (*Id.*). Jackson alleges that Smith informed "Officer Woody[] and Cpl. McCalister" that Jackson could not attend his scheduled appointment at Health Right on July 8, 2019 because his disciplinary hearing was "unexpectedly moved up a day, without notice." (*Id.*). As for administrative remedies, Jackson contends that the process by which he could have challenged his guilt for refusal to work was unavailable as he was transferred to another facility "before he was able to file and follow the appropriate steps in disputing the issues at hand." (*Id.* at 2–3). He claims he attempted to speak to Warden Stinnett and file an appeal, but was not able to do so. (*Id.* at 3).

### 3. *DCR Defendants' Reply*

The DCR Defendants filed a reply to Jackson's response on November 16, 2021.

(ECF No. 97). First, they contend that Jackson's response violates Rule 11(a) and should be stricken because he did not sign the document. (*Id.* at 1).[1] Next, the DCR Defendants reiterate their position that Jackson has not shown a constitutional violation by Smith. (*Id.* at 2). While conceding that Jackson had documentation of the work restrictions suggested by CAMC medical staff, the DCR Defendants contend that Smith decided to charge Jackson with refusing to work based on his failure to report to work on June 18, 2019, and her conversation with Elswick in which he informed her of Jackson's lack of effort and complaints regarding his assigned duties. (*Id.* at 2–3). The DCR Defendants posit that, as Jackson has not produced evidence that Smith only filed an incident report due to Jackson's injury or acted otherwise improperly, she did not violate Jackson's rights and is entitled to qualified immunity. (*Id.* at 3).

As to Henderson, the DCR Defendants assert that Jackson has not provided evidence showing that she was deliberately indifferent to his serious medical needs based on the rescheduling of his appointment at Health Right. (*Id.* at 3). They also note that although Jackson states Henderson did not allow him to go to the emergency room for a swollen foot, logs show that he went to CAMC on June 17 and June 28, 2019, and to Health Right on June 28, 2019. (*Id.* at 4). Therefore, the DCR Defendants reason, Jackson cannot show any evidence of deliberate indifference to his medical needs. (*Id.*). As to Greenwood, the DCR Defendants repeat their position that judicial immunity applies and Jackson does not present evidence that shows that the disciplinary hearing deprived him of any civil or constitutional right. (*Id.* at 4–5).

---

[1]On December 13, 2021, Jackson submitted two copies of his original responses to both the DCR Defendants and Elswick, seemingly identical save for the addition of signatures. (ECF Nos. 99, 100). The undersigned regards these submissions as attempts to appease the DCR Defendants' concerns about his failure to sign his response and will not strike his responses.

Regarding Jackson's assertion that he was not able to access administrative remedies because of his transfer to a different facility, the DCR Defendants point out that the incidents Jackson complains of occurred between June 17 and 18, 2019, and he was not transferred until July 10, 2019. (*Id.* at 5–6). Accordingly, the DCR Defendants reason that Jackson's claims should be dismissed as he has not exhausted his administrative remedies. (*Id.* at 6).

### B.    Elswick's Motion for Summary Judgment

#### 1.    *Motion and Memorandum of Law*

Elswick filed a motion for summary judgment on October 15, 2021. (ECF Nos. 90, 91). Therein, Elswick reasserts his claim from the previously denied motion to dismiss that he is not subject to liability for his actions under the doctrine of qualified immunity. (ECF No. 91 at 5–6). He contends that "there is no clearly established law" that the conditions on the hillside "created a sufficiently serious deprivation [so] as to violate the Eighth Amendment's prohibition against cruel and unusual punishment." (*Id.* at 7). Elswick emphasizes that he "was not present on the job site on June 14, 2019" when Jackson was allegedly injured. (*Id.*). Thus, Elswick reasons, Jackson cannot demonstrate that Elswick acted with deliberate indifference. (*Id.*).

Next, Elswick argues that "Jackson has failed to establish that any act or omission of [Elswick] violated his rights afforded by the Eighth Amendment." (*Id.*). He contends that Jackson proffered no medical evidence showing he had physical limitations rendering his work on the hillside unsafe. (*Id.* at 8). Noting that Jackson testified in deposition that he told Elswick about the pins and plates in his feet prior to his fall, Elswick denies that he had subjective knowledge of a substantial risk of harm to Jackson or acted with deliberate indifference. (*Id.* at 8–9). Further, Elswick contends that

7

Jackson's claims do not constitute an Eighth Amendment violation in the context of a prison workplace. (*Id*. at 8–11). He insists that the record does not show that he was aware of previous accidents involving Jackson in which Jackson suffered a foot or ankle injury, claiming that Jackson's only documented accident while working with DOH was in March 2019 and resulted in a facial scratch. (*Id*. at 11). Elswick asserts that Jackson's allegations "[a]t best" state a claim for negligence, which is insufficient to satisfy the federal standard. (*Id*. at 12).

With regard to Jackson's claims that Elswick violated his rights by firing him from the work crew, Elswick counters that Jackson had no right to a particular prison work assignment, the decision was in the sole discretion of DCR, and Jackson admits he was physically unable to perform the DOH work. (*Id*. at 12–14). Finally, like the DCR Defendants, Elswick maintains that Jackson's complaint should be dismissed because he failed to exhaust his administrative remedies before filing suit. (*Id*. at 14–15).

## 2. *Jackson's Response*

On November 3, 2021, Jackson responded to Elswick's motion. (ECF No. 96). He disputes Elswick's claim that he was not aware of Jackson's previous injury, stating that the two had "at least one conversation" about the injury to his left ankle, during which he showed Elswick the scars on his ankle. Jackson claims that the interaction was witnessed by several others. (*Id*. at 1). As to his claim that he was "wrongfully terminated," Jackson claims that his firing was prompted only by his injury and that any issue with his complaints about weed eating went unmentioned before his accident. (*Id*.). Jackson reiterates that he has a right to safe working conditions while on assignment with DOH, yet Elswick required him to work on the hillside even though he possessed "firsthand knowledge" of Jackson's previous ankle injury. (*Id*. at 1–2).

8

Jackson contends that Elswick's actions violated his rights because he fired Jackson after his workplace injury and because he ordered Jackson to work on the hillside in dangerous conditions given Jackson's ankle injury. (*Id.*). He disagrees that qualified immunity applies, and blames Elswick for setting off the chain of events that resulted in disciplinary sanctions and Jackson's placement in administrative segregation, "which is a form of cruel and unusual punishment" that he contends violates his rights. (*Id.*). As to administrative remedies, Jackson states that he was not able to file remedies before his transfer to a different facility, and his requests to speak with prison officials was denied. (*Id.*).

### 3. *Elswick's Reply*

On November 19, 2021, Elswick filed a reply to Jackson's response. (ECF No. 98). He again argues that he is entitled to qualified immunity, reiterating his position that he did not violate Jackson's Eighth Amendment rights by placing him in danger, and asserts that Jackson has not provided evidence that Elswick was deliberately indifferent. (*Id.* at 3–4). Elswick maintains that Jackson also has not submitted evidence of a physical condition that made the hillside an unsafe work environment, or that shows Elswick knew the work would be dangerous for Jackson. (*Id.* at 4–6). He states that Jackson did not have a medical excuse indicating a physical limitation, and Jackson's earlier accident while on assignment with DOH involving a woodchipper did not suggest that Jackson would be unable to work on steep hillsides. (*Id.* at 6– 7). Next, Elswick argues that he did not place Jackson in a dangerous work environment because DCR was responsible for assessing prisoners' fitness for work assignments and Elswick was not the crew leader supervising Jackson on the day he was injured. (*Id.* at 8–10). He restates his argument that he did not violate Jackson's rights by removing him from the

DOH work assignment given that he had no protected interest in being assigned to DOH. (*Id.* at 11–14). Finally, Elswick restates his claim that Jackson's suit should be dismissed for failure to exhaust administrative remedies. (*Id.* at 14–18).

## II.  <u>**Standard of Review**</u>

The DCR Defendants and Elswick both move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF Nos. 88, 90). Under Rule 56, summary judgment is proper when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 501 U.S. at 248. Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). The court shall "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine,* 501 U.S. 496, 520 (1991). Consequently, motions for summary judgment impose a heavy burden on the moving party; it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson, Inc.,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be

viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

Courts are required to liberally construe *pro se* complaints, such as the complaint filed herein. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, even under this less stringent standard, the complaint still must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The Court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the Court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

**III.    Discussion**

Jackson's complaint is made pursuant to 42 U.S.C. § 1983, which provides a remedy to parties who are deprived of federally protected civil and constitutional rights by persons acting under color of any state "law, statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983. The statute "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)) (internal markings omitted). Congress enacted § 1983 "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or

misuse it." *Monroe v. Pape*, 365 U.S. 167, 171-172 (1961), *overruled on other grounds by* 436 U.S. 658.

In order to state a cause of action under § 1983, a plaintiff must present facts showing that: (1) a person deprived him or her of a federally protected civil right, privilege or immunity and (2) that the person did so under color of State law. *Perrin v. Nicholson*, C/A No. 9:10-1111-HFF-BM, 2010 WL 3893792, at *2 (D.S.C. Sept. 8, 2010); *see also American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."). If either of these elements is missing, the complaint fails to state a claim for relief under § 1983. *American Mfr. Mut. Ins. Co.,* 526 U.S. at 50.

As Jackson filed this suit while in state custody, his ability to raise claims under § 1983 is controlled by the Prison Litigation Reform Act ("PLRA"). Of particular relevance to this action, the PLRA requires prisoners to exhaust administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Exhaustion under the PLRA requires the prisoner to use "all steps that the agency holds out," and to do so "properly"; thus, giving the agency the opportunity to address the issues on the merits. *Lotharp-Crawford v. Mountain View Corr. Inst.*, No. 1:21-CV-00291-MR, 2022 WL 23141, at *2 (W.D.N.C. Jan. 3, 2022) (quoting *Woodford v. Ngo,* 548 U.S. 81, 90 (2006)).

## A.     Lack of Exhaustion

All of the defendants argue that Jackson failed to exhaust available administrative remedies. The law is clear that the exhaustion requirement imposed by the PLRA cannot be waived. *See Porter v. Nussle,* 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.") (citations and internal quotation marks omitted). The purpose of the exhaustion requirement is twofold: first, "exhaustion protects administrative agency authority" by giving an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court ... and it discourages disregard of the agency's procedures;" second, "exhaustion promotes efficiency," as claims "generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court" and sometimes "claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court." *Woodford*, 548 U.S. at 89 (citations and internal quotation marks omitted). Further, "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.*

In *Ross v. Blake*, the Supreme Court of the United States ("Supreme Court") considered a case in which a Maryland state inmate filed a § 1983 complaint concerning the actions of prison correctional officers. *Ross*, 136 S. Ct. 1850, 1855 (2016). One of the officers raised the PLRA's exhaustion requirement as an affirmative defense, stating that

the inmate sued without first following the prison's prescribed procedures for obtaining an administrative remedy. *Id.* The District Court dismissed the lawsuit for lack of exhaustion, but the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") reversed the decision, stating that the PLRA's exhaustion requirement was "not absolute" and special circumstances could excuse exhaustion, such as when a prisoner reasonably, but mistakenly, believed that he had sufficiently exhausted his administrative remedies. *Id.* at 1856. Upon review, the Supreme Court explicitly rejected the Fourth Circuit's "special circumstances" exception, noting the exhaustion requirement in the PLRA is statutorily mandated and not amenable to judicially created exceptions. *Id.* The Supreme Court explained that the mandatory language of the PLRA meant that a court may not excuse a failure to exhaust, even to take special circumstances into account. *Id.*

The Supreme Court noted in *Ross* that the PLRA does contain one express exception: an inmate need not exhaust "unavailable" remedies. *Id.* at 1858. The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 1860. "[S]uch interference with an inmate's pursuit of relief renders the administrative

process unavailable." *Id.*

At all times relevant to this action, including the date it was filed, Jackson was an inmate in custody of the DCR. Consequently, he was also required to exhaust his administrative remedies in accordance with the West Virginia Prisoner Litigation Reform Act, W. Va. Code § 25-1A-1, *et seq.*, before filing this federal lawsuit. In West Virginia, the administrative remedy procedure of an inmate's place of confinement governs the exhaustion process. *White v. Haines*, 618 S.E.2d 423, 431 (W. Va. 2005) ("[B]efore an inmate may bring a civil action challenging the conditions of his/her confinement, he/she must first exhaust the administrative remedies provided by the correctional facility in which he/she is housed."). Exhaustion of administrative remedies in regard to claims involving the conditions of confinement at a state correctional facility required a "final decision from the Commissioner of Corrections or the Commissioner's designee, or the Executive Director of the Regional Jail Authority, or the Director's designee." W. Va. Code Ann. § 25-1A-2. The DCR's Policy Directive 335.00 established procedures whereby state inmates may seek review of complaints relating to any aspect of their imprisonment. To complete the internal grievance procedures, the inmate must first submit a G-1 Grievance Form to the Unit Manager within fifteen days of the occurence. If the Unit Manager's response is unfavorable, the inmate may appeal within five days to the Warden/Administrator by filing a G-2 Grievance Form. If the Warden/Administrator's response is unfavorable, the inmate may make a final appeal to the Commissioner/designee of the Division of Corrections. The administrative remedy process must be completed within 60 days. *See Sullivan v. King,* No. CV 3:17-02347, 2018 WL 651815, at *5 (S.D.W. Va. Jan. 8, 2018), *report and recommendation adopted*, No. CV 3:17-2347, 2018 WL 650217 (S.D.W. Va. Jan. 31, 2018). Jackson does

not deny that an administrative remedy procedure was in place at all facilities where he was housed.

Even if West Virginia law provides exceptions to the state's exhaustion requirement that are not offered under the PLRA, the federal exhaustion requirements govern this action. As stated, exhaustion of remedies is mandatory and has limited exception. *Porter,* 534 U.S. at 524. Therefore, Jackson must have exhausted the state's administrative remedies unless they were unavailable to him. *Freeland v. Ballard*, No. 2:14-CV-29445, 2017 WL 337997, at *3 (S.D.W. Va. Jan. 23, 2017) (collecting cases).

In response to Defendants' assertion that Jackson failed to exhaust his available remedies, Jackson concedes that he did not complete the administrative remedy process for any of the claims described in his amended complaint. (ECF Nos. 95 at 2, 96 at 2). He indicates that he "tried to follow the procedure" but "due to his transfer to HCC, he was unable to follow the appropriate steps to dispute the wrongful termination" and his write-up for the rule violation. (ECF No. 95 at 2–3). However, Jackson provides no further explanation as to why he was not able to avail himself of the grievance procedure at CCCJ, or HCC once he was transferred. The mere fact that Jackson was transferred is inadequate to support the conclusion that his administrative remedies were unavailable. Transfer to a different location does not excuse prisoners from the PLRA's exhaustion requirement. *Zander v. Lappin*, No. 5:08-CT-3117-FL, 2012 WL 3138012, at *5 (E.D.N.C. Aug. 1, 2012), *aff'd*, 509 F. App'x 203 (4th Cir. 2013) ("To the extent plaintiff asserts that his transfer from Butner to Oakland prevented him from complying with the BOP's administrative remedy procedure, his duty to exhaust is not excused by transfer to another institution."); *King v. United States*, No. 5:09-CV-00068, 2012 WL 147904, at *3–4 (S.D.W. Va. Jan. 18, 2012), *aff'd*, 536 F. App'x 358 (4th Cir. 2013) (affirming

magistrate judge's finding that transfer does not render administrative remedies unavailable); *Custer v. West Virginia Northern Regional Jail*, 2009 WL 1390817 (N.D.W. Va. May 15, 2009) ("There is simply nothing in the PLRA, or the pertinent case law, which supports the plaintiff's assertion that a transfer to another facility necessarily renders his administrative efforts futile."); *Hendricks v. Barnes*, 2007 WL 2257565, *2 (M.D.N.C. Aug. 3, 2007) ("[A] plaintiff will not be excused from exhaustion because he is no longer at the facility where the complained of incident occurred."); *Berry v. Prime Care Med.*, No. CV 5:17-02064, 2019 WL 6307430, at *4 (S.D.W. Va. Sept. 25, 2019), *report and recommendation adopted sub nom. Berry v. Prime Med. Care*, No. 5:17-CV-02064, 2019 WL 6307357 (S.D.W. Va. Nov. 22, 2019); *Jackson v. Studel*, No. 3:10CV177 MU 02, 2010 WL 1689095, at *2 (W.D.N.C. Apr. 26, 2010)

Furthermore, as the DCR Defendants point out, Jackson remained at CCCJ until July 10, 2019, and did not make use of the administrative remedy process even though the deadline to file a timely grievance—at least as to his June 14 injury—would have expired before he was transferred. (ECF Nos. 97 at 5–6). This strongly suggests that Jackson simply made no effort to seek redress through the grievance process before filing suit. *Gilmore v. Brown Creek Prison*, No. 3:14-CV-413-FDW, 2014 WL 5581110, at *2 (W.D.N.C. Oct. 31, 2014) ("[T]he fact that Plaintiff may have been transferred to another facility does not excuse his failure to file a grievance while at Brown Correctional or even following his transfer. This is especially true because Plaintiff remained at Brown Correctional for nearly three weeks after the fight and before he was transferred."). Jackson does not attempt to explain how his transfer from CCCJ weeks after the incidents described in his complaint rendered administrative remedies unavailable, and the undisputed evidence in the record demonstrates he had ample time to file grievances

17

there and at HCC following transfer.

Moreover, as Elswick emphasizes, Jackson worked for the DOH from January 2019 until his accident on June 14, 2019. During that six-month period, Jackson never submitted a grievance complaining that the work assignment was unsafe or too physically taxing. Jackson testified that he told Elswick early on that his ankles prevented him from working on uneven terrain; yet, he never filed a grievance indicating that he was asked to work on hillsides. Jackson contends that on occasions prior to his fall, he overheard Elswick instructing the crew supervisor to order Jackson to work where the other inmates were working despite the conditions, (ECF No. 96 at 2), yet he never formally challenged his work assignment through the administrative remedy process.

Jackson contends that he attempted to speak to staff about his concerns, and he attaches an inmate request form from the CCCJ in which he informed the warden that he had been injured while on work release and asked for help "concerning the situation." (ECF No. 95-5 at 1). The warden's response provided only that Jackson's situation had been addressed by other staff. (*Id.*). Request forms like the one Jackson attaches are not equivalent to the grievance procedure, and Jackson's statement does not evince an *attempt* to use the prison administrative remedy program before or after his fall, let alone excuse exhaustion.[2]

The only other justification Jackson has offered for not exhausting his

---

[2] Jackson did, however, appeal his punishment for refusing to provide a urine sample, an appeal which was denied by the CCCJ warden. Jackson emphasizes that he does not challenge the outcome of that disciplinary proceeding in this action. (ECF Nos. 95-7, 95-8, 95-9). However, his administrative appeal of the second disciplinary charge makes plain that Jackson was aware of the appellate process in place and could have challenged the Hearing Officer's finding in the disciplinary action currently in dispute.

administrative remedies during the pendency of this litigation was made in response to the DCR Defendants' prior motion for summary judgment. (ECF Nos. 35 at 1, 45 at 1–2). There, Jackson asserted that he was denied the proper forms to mount his "appeal" and was unable to respond to its denial because he was in administrative segregation during the relevant time period. (ECF Nos. 35 at 1, 45 at 1–2). When reviewing the prior motion, the undersigned concluded that the record had not been sufficiently developed at that point to support dismissal of the complaint. (ECF No. 68 at 16–18). However, the parties have now completed discovery.

The undersigned notes that Jackson did not reiterate his former assertions in his responses to the current motions and did not direct the Court to *any evidence* generated during discovery that would support such claims. According to an exchange at Jackson's deposition, he was placed in a holding facility at CCCJ approximately forty minutes after his second disciplinary hearing, (ECF No. 98-1 at 16), and was transferred later—on July 10, 2019—to HCC. (ECF No. 97-2). However, Jackson was not placed in segregation at HCC until July 30, 2019, well beyond the deadline for filing grievances related to his fall and the first disciplinary action. (ECF No. 98-1 at 14-15). During the first twenty-day period at HCC, before Jackson was placed in segregation, he appealed the second disciplinary finding. Yet, he made no effort to appeal the disciplinary charge at issue here, or any of the other matters raised in his amended complaint. Accordingly, there is simply no evidence that Jackson attempted to file grievances regarding the claims in this case at any point in time, or that his placement in administrative segregation weeks later had any bearing whatsoever on his ability to utilize the grievance procedure. As such, the undersigned **FINDS** that Jackson's former arguments regarding the unavailability of remedies have been abandoned, and in any event, they lack support in the available

record.

In sum, even considering Jackson's unfounded assertions that he was "unable" to exhaust his administrative remedies due to his transfer from CCCJ, Jackson presents no evidence and makes no argument that warrants excusal of his failure to utilize the grievance system in place at every facility where he was housed. Transfer does not render administrative remedies unavailable. Jackson's unsupported contention presented in response to the DCR Defendants' since-resolved motion for summary judgment was not revived in this round of motions. To date, these unsubstantiated, and subsequently discarded, remarks are the only "scintilla of evidence" that administrative remedies were unavailable to Jackson prior to his filing this action. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Therefore, the undersigned **FINDS** that Jackson's claims cannot survive Defendants' motions for summary judgment and further **FINDS** that the amended complaint should be dismissed.

Because Jackson's amended complaint must be dismissed for failure to exhaust available administrative remedies, it is unnecessary to address the remaining grounds raised by the DCR Defendants and Elswick in support of their motions. *See Salmons v. W. Reg'l Jail*, No. CV 3:18-01475, 2020 WL 2949927, at *1 (S.D.W. Va. Apr. 30, 2020), *report and recommendation adopted*, No. CV 3:18-1475, 2020 WL 2945539 (S.D.W. Va. June 3, 2020). Nonetheless, the undersigned has considered whether the individual claims are sufficient to withstand summary judgment as discussed below. Before doing so, the undersigned notes that, while the parties disagree about some facts, there are no *material* factual disputes that prevent summary judgment.

### B.     Claims Against Elswick

Jackson asserts two claims against Elswick. First, he alleges that Elswick put him

in an dangerous position by requiring him to weed eat on the side of a steep hill after it had been raining, making the hillside muddy and slippery. (ECF No. 54 at 1). Second, he contends that Elswick wrongfully terminated Jackson's work release assignment to the DOH after his fall, causing him to be disciplined. (ECF No. 96). In support of his claims against Elswick, Jackson attaches W. Va. Code § 23-5A-3, a workers compensation provision which prohibits an employer from terminating an employee while he or she is off work due to a compensable injury. (ECF No. 96-1). Jackson also submits the Disciplinary Incident Report completed by Smith; the Hearing Report; the DCR's description of the Class II offense of refusal to work; Jackson's request to the Warden of CCCJ to discuss the injury and disciplinary action; portions of his CAMC records; and information obtained from a law firm blog regarding the rights of employees. (ECF Nos. 96-2 through 96-7).

In support of his motion for summary dismissal, Elswick provides the Court with the transcript of Jackson's deposition, (ECF No. 98-1), as well as Jackson's discovery responses to Elswick's interrogatories; an incident report reflecting an injury sustained by Jackson in March 2019 while working on the DOH inmate work crew; and the contract between the DOH and the DCR governing inmate participation in DOH work crews. (ECF Nos. 90-2 through 90-4). Of relevance to this discussion, Elswick emphasizes that there is no evidence of him having subjective knowledge of a serious medical condition suffered by Jackson. (ECF No. 91 at 7-11). In addition, Elswick argues that because Jackson had no right to inmate employment, his removal from the DOH work crew did not create a cognizable claim under § 1983. (*Id*. at 12-14). Elswick further contends that, in any event, Jackson could not return to the DOH's inmate work crew after his fall, because he was physically unable to do the work required.

21

Looking first at the claim alleging that Jackson was placed in harm's way, the Eighth Amendment to the United States Constitution protects against the infliction of "cruel and unusual punishments." "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Incarcerated people are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds by Bell v. Wolfish*, 441 U.S. 520. *See also Farmer v. Brennan*, 511 U.S. at 832 (noting that the Eighth Amendment imposes duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates'").

To establish a violation of the Eighth Amendment when challenging the conditions of confinement, an inmate must allege (1) an objectively "sufficiently serious" deprivation and (2) that prison officials subjectively acted with "deliberate indifference" to the inmate's health and safety. *Wilson v. Seiter*, 501 U.S. 294, 297–99 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission...result[s] in the denial 'of the minimal civilized measure of life's necessities.'" *Id*. at 298 (internal citations omitted). To establish the subjective component, an inmate must allege and prove a defendant's consciousness of the risk of harm. *See Farmer*, 511 U.S. at 840. It "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997); *see also Banks v. Gore*, 738 F. App'x 766, 770 (4th Cir. 2018). Deliberate indifference is more than mere negligence but less than malice. *Flores v. Stevenson,* Civil Action No. 2:11–cv–01278–TMC–BHH, 2012 WL 2803721 (D.S.C. May

22

11, 2012); *Brown v. North Carolina Dept. of Corrections*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)) ("[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.").

The evidence in this case simply does not establish that Elswick was aware that Jackson's pre-existing medical condition placed him at an excessive risk of harm when working on hillsides, and that Elswick nonetheless disregarded the risk to Jackson. Jackson testified that he started work release with the DOH on or around January 5, 2019. (ECF No. 98-1 at 4). According to Jackson, at some point early in his assignment to the DOH work crew, he told Elswick about the pins and plates in his ankles and feet from a prior injury and showed Elswick the scars. (*Id.* at 5). Jackson explained at deposition that the pins and plates were related to an accident he had in 2003,[3] and he had not received treatment for his injuries in more than fifteen years. (*Id.*). Jackson conceded that he had no medical excuse saying that he was physically unable to perform the tasks on the DOH work crew. (*Id.*).

Although Jackson told Elswick about the pins and plates in his feet, he provides no evidence supporting the conclusion that the existence of these pins and plates put him at a greater risk of injury than the other inmates performing the same work tasks. Jackson had no physician's excuse; he was not receiving treatment, and he had no acute symptoms or injuries. There is no evidence that Jackson had a noticeable weakness of his feet and ankles, or limitations in his ability to walk or stand. He performed on the

---

[3] According to the American Academy of Orthopaedic Surgeons, screws and plates are used to stabilize and support a broken bone until it is strong enough to handle the body's weight and movement. While casts and splints provide support and stabilization outside of the body, screws and plates allow internal support and stabilization. *See* https://orthoinfo.aaos.org/en/treatment/internal-fixation-for-fractures/.

DOH work crew for six months prior to his fall with no documented difficulties in managing the tasks assigned to him due to the condition of his ankles and feet. Moreover, the fall occurred when the hillside was muddy and slippery from rain storms—which are conditions that can cause people to slip and fall, even when they do not have pins and plates in their feet and ankles. Jackson presents little factual support for his assertion that having pins and plates in his feet and ankles caused him to fall on June 14, 2019, or that having old pins and plates in the feet limit an individual's ability to use a weed eater or stand on a hillside.

The effect of having pins and plates in the feet on an individual's ability to perform certain job functions is not so obvious a matter as to be within the common knowledge of a lay person. Jackson does not establish that Elswick's knowledge of the pins and plates triggered a corresponding subjective knowledge on Elswick's part that Jackson would be at an excessive risk of harm if he were asked to perform the same tasks as other inmates. "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citations omitted).

Indeed, the evidence of record suggests otherwise. First, the contract between the DCR and DOH required the DCR to select inmates for DOH work crews who were physically and mentally equipped to do the work. (ECF No. 90-4 at 1). Thus, Elswick could reasonably have presumed that, despite having old pins and plates in his lower extremities, Jackson was capable of doing the required tasks. Second, although Jackson said he complained about having to weed eat on hillsides, he also testified that other inmates made the same complaint, because they did not like working on hillsides either.

(ECF No. 98-1 at 8). Consequently, the complaints themselves would not have triggered subjective knowledge of an excessive risk of harm to Jackson. Next, there is no documentation that Jackson had unique difficulties performing the weed eating tasks, or that he had reported any particular incident in which his feet or ankles gave way when he was working on the side of a hill. Prior to his fall, the only injury Jackson suffered when working on the DOH inmate crew was being hit in the face with tree branches while using a wood chipper. (ECF No. 90-3). There simply is no evidence that Elswick's knowledge of Jackson's wood chipper incident made Elswick aware that Jackson would be at an increased risk of harm  if he used a weed eater on the side of a hill.

Lastly, Jackson fails to offer evidence that, despite having subjective knowledge of the risks to Jackson, Elswick placed him on the side of a hill that was particularly slippery because of recent rains. Jackson testified that Elswick "was all over" the crew supervisor if Jackson was not on the side of the hill cutting grass with the other inmates, (ECF No. 98-1 at 6), but he admitted that (1) Elswick was not present on the day Jackson fell; and (2) Elswick was not the person that instructed Jackson to weed eat that day on a slippery hill. (*Id.* at 5). Even if Elswick had instructed the crew supervisor to put Jackson on the hillside on other occasions, there is no evidence that Elswick did so when the hill was muddy and slippery from rain. Therefore, the undersigned **FINDS** that Jackson fails to state a viable claim against Elswick based upon the conditions of his work environment.

With respect to Jackson's claim that Elswick wrongfully terminated him from work release with the DOH, Elswick is correct that such a claim is not cognizable under § 1983. "[I]nmates do not have a constitutional right to a prison job, and in turn, the deprivation of a prison job states no independent constitutional claim." *Patel v. Moron*,

897 F. Supp. 2d 389, 400 (E.D.N.C. 2012) (citing *Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir.1995)). The same applies to work release. *See Beasley v. Duncil*, 792 F. Supp. 485, 486-87 (S.D.W. Va. 1992), *aff'd sub nom. Hundley v. Skaff*, 9 F.3d 1106 (4th Cir. 1993) (holding that "[a]bsent a state created liberty right, assignment to a work release center is within the discretion of prison officials ... West Virginia does not grant a liberty right in work release."). In West Virginia, inmate participation in work programs and work release are at the discretion of the DCR; therefore, the DCR has the authority to terminate an inmate's participation in work release whenever the DCR decides to do so. Because Jackson had no protected right to his position on the DOH work crew, he has no claim related to his termination from that position.

Furthermore, the workers' compensation provisions relied upon by Jackson do not apply to his DOH work, because inmates on work release are not entitled to workers compensation benefits. *See Crawford v. W. Virginia Dep't of Corr.-Work Release*, 239 W. Va. 374, 380, 801 S.E.2d 252, 258 (2017) (citing W. Va. Code § 23-4-1e(b)). Jackson cites W. Va. Code § 23-5A-3, a workers compensation statute that prohibits employers from terminating injured employees. However, the statute clarifies that it applies only to employees "off work due to a compensable injury within the meaning of article four of this Chapter and is receiving or is eligible to receive temporary total disability benefits." W. Va. Code § 23-5A-3(a). Article four of the Chapter explicitly states:

> Notwithstanding any provision of this code to the contrary, no person confined in a state correctional facility or jail who suffers injury or a disease in the course of and resulting from his or her work during the period of confinement which work is imposed by the administration of the state correctional facility or jail and is not suffered during the person's usual employment with his or her usual employer when not confined shall

> receive benefits under the provisions of this chapter for the injury or
> disease

W. Va. Code § 23-4-1e(b). The only exceptions to this prohibition involve employment of inmates by private entities under a Prison Industry Enhancement Program, which do not include Jackson's participation on the DOH inmate work crew. The DCR and the DOH acknowledge as much in their contract, stating that "inmates performing services under this agreement will not be employees of the State entitling them to any benefits such employees might have, including, but not limited to, insurance, workers compensation, benefits, pensions, sick and annual leave." (ECF No. 90-4 at 4). Therefore, Jackson's work with the DOH does not fall within the provisions related to discriminatory termination. For these reasons, the undersigned **FINDS** that Jackson fails to state a viable claim against Elswick relating to Jackson's termination from the DOH inmate work crew.

### C.    Claim Against Defendant Smith

Jackson alleges that Smith "abused her power" by charging him with a disciplinary violation for refusing to work, even though he had shown her his CAMC record verifying that he was injured on the job. (ECF No. 54 at 1). Jackson contends that Smith wrote the charging document based solely on Elswick's statements, without considering the evidence or conducting any investigation. In opposition to Smith's request for summary judgment, Jackson attaches a copy of the Disciplinary Incident Report, (ECF No. 96-2), and a partial copy of DCR Policy Directive 325.00. (ECF No. 96-4). The Policy Directive designates the charge of "refusal to work" as a Class II offense and clarifies that a refusal to work includes refusing a work detail or assignment, refusing to follow orders or instructions, leaving a place of assignment without

permission from the person in charge, being absent without permission, or violating the terms of the work contract. (*Id.*). Jackson also submits a portion of his ER record from CAMC dated June 17, 2019. (ECF No. 96-6). The record documents that Jackson was seen in the Emergency Room at 1:23 p.m., complaining of leg pain and swelling, as well as vomiting. (*Id.*). An x-ray showed fractured interosseous screws in Jackson's ankle, but no acute bone fracture or dislocation. The record does not estimate how long the screws had been fractured or comment on whether the fractures were traumatic in origin, or simply the result of normal wear and tear. Furthermore, there is no evidence that Jackson's ankle was treated, and he was discharged with a "light duty" work limitation. (*Id.* at 5).

In addition to these records, a copy of Jackson's deposition transcript was filed with the Court. (ECF No. 98-1). In the transcript, Jackson testifies that he told Smith about his prior ankle injury and expressed that he could not do a job that required him to walk long distances, stand long periods of time, or work on the side of a hill. (*Id.* at 5). Later in the deposition, Jackson admitted that he did not go to work after his fall on Friday, June 14, 2019, because he went to the hospital on Monday, June 17, 2019. (*Id.* at 6, 8). Jackson conceded that he did not receive permission from Smith to miss work on June 17th and 18th, but he did tell Ms. Clark, who scheduled physician appointments, that he had injured his leg. (*Id.* at 6-8). He did not file any grievances stating that he had been injured or that he could not do the work assigned to him. (*Id* at 13). Also in the deposition, Jackson clarified that he was not making a claim related to the disciplinary charge of failing to provide a urine sample, although he believed that his hearing on that charge was moved up one day to hinder him from obtaining medical records showing that he had a urinary condition that prevented him from providing the requested

sample. (ECF No. 98-1 at 15).

A copy of the Disciplinary Incident Report completed by Smith states that Smith had a telephone conversation with Elswick on June 18, 2019 regarding Jackson's injury. (ECF No. 96-2). Smith advised Elswick that Jackson reported twisting his ankle and "popping a pin" from a previous injury while he was working on the road crew. She asked if the crew boss had prepared a written report for her. Elswick replied that Jackson had not reported the incident. He added that Jackson persistently complained about the work he was asked to do, because he did not want to use the weed eater. Elswick stated that he did not want Jackson to return to the DOH crew due to his "lack of effort and his constant complaints of the work he was asked to perform." (ECF No. 96-2).

A copy of the Incident Report was provided to Jackson on June 27, 2019. (*Id*.). Jackson was advised that a hearing would take place on the charge before a Correctional Hearing Officer on July 2, 2019. The written report notified Jackson of his rights; including, the right to testify and call witnesses, cross-examine witnesses, and seek the assistance of a representative to help him answer the charge. (*Id*.). Jackson was also provided with information on how and when to appeal an unfavorable decision. Jackson subsequently had a hearing on the disciplinary charge and was found guilty. (ECF No. 96-3).

Based on the facts developed during discovery, Jackson fails to state a viable claim against Smith. The act of filing a disciplinary charge does not by itself violate a prisoner's constitutional or civil rights. This is true even when the charge is false and the punishment is loss of a protected liberty interest, as long as the prisoner receives a hearing and has an opportunity to rebut the charge. *See, e.g., Pruitt v. FCI Morgantown*, No. 1:20CV228, 2020 WL 11232160, at *6 (N.D.W. Va. Sept. 28, 2020), *report and*

*recommendation adopted,* No. 1:20-CV-228, 2021 WL 4303679 (N.D.W. Va. Sept. 21, 2021) ("The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights.") (citing *Freeman v. Rideout*, 808 F.2d 949, 952-53 (2nd Cir. 1986) (holding that "the mere filing of [a false] charge itself" does not constitute a cognizable claim under § 1983 so long as the inmate "was granted a hearing, and had the opportunity to rebut the unfounded or false charges")); *also Brown v. Hannah*, 850 F. Supp. 2d 471, 475 (M.D. Pa. 2012) ("The general rule ... provides that a 'prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'"). Here, Smith prepared a disciplinary charge based upon information that Jackson chronically complained about his work assignments, was not welcomed back to the DOH crew, and had not returned to work since his fall. Contrary to Jackson's belief, the charge was a Class II violation—not a Class I violation—and the punishment did not involve the loss of a protected liberty interest. Even still, Jackson received a statement of the charges, a notice of a hearing, a statement of his rights, a hearing before a Correctional Hearing Officer, an opportunity to submit evidence, and the right to appeal the unfavorable decision. Consequently, the undersigned **FINDS** that there is no factual basis to support Jackson's claim against Smith.

### D.    Claim Against Greenwood

Jackson alleges that Greenwood "abused his power" by finding Jackson guilty of refusing to work notwithstanding documentation establishing that Jackson had suffered an injury which prevented him from working. (ECF No. 54 at 1-2). Although Jackson contends in his response to Greenwood's motion for summary judgment that Greenwood sent him to solitary confinement as part of his punishment, (ECF No. 95 at

2), the paperwork submitted by Jackson demonstrates that he is incorrect. After finding Jackson guilty of refusing to work, Greenwood punished him with a thirty-day loss of privileges and transfer to a more secure facility. (ECF No. 98-4 at 2). Jackson was not punished with solitary confinement until after he was found guilty of failing to submit a urine specimen. (ECF No. 95-7). The punishment meted out in this instance is significant, because it affects the due process rights afforded to Jackson.

The Due Process Clause of the Fourteenth Amendment mandates that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Imprisonment for a crime does not completely divest a person of due process protections. *Wolff v. McDonnell,* 418 U.S. 539, 555–56 (1974). However, prison disciplinary proceedings are not part of a criminal prosecution; therefore, the full panoply of rights due a defendant in criminal proceedings does not apply to prison disciplinary actions. *Id.* at 556 (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).

In order to raise a constitutional challenge to disciplinary proceedings in a state facility, Jackson must demonstrate that he was "deprived of a state-created liberty interest protected by the Due Process Clause." *Prince v. Crawford*, No. 3:16-CV-02317, 2017 WL 2991350, at *14 (S.D.W. Va. May 31, 2017). "'States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life*.'" *Beverati v. Smith,* 120 F.3d 500, 502 (4th Cir. 1997) (quoting *Sandin v. Conner,* 515 U.S. 472, 483–84, (1995)) (emphasis in original). "As long as the conditions or degree of confinement

31

to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242 (1976). In other words, when a penalty for a disciplinary infraction does not inevitably affect the length of an inmate's term of confinement, his constitutionally protected liberty interests are limited to freedom from restraint that imposes atypical and significant hardship on him in relation to the ordinary incidents of prison life. *Sandin*, 515 U.S. at 484. Accordingly, in Jackson's case, the question becomes whether loss of privileges for thirty days and transfer from work release to a more secure facility trigger due process protections.

The law is well settled that the loss of privileges generally does not implicate the Due Process Clause. *Shirley v. Woodson*, No. 7:19-CV-00535, 2020 WL 2263516, at *2 (W.D. Va. May 7, 2020) (citing *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently."). Moreover, the transfer of inmates is "discretionary and not mandatory in nature, and as such no liberty right is created." *Beasley v. Duncil,* 792 F. Supp. 485, 487 (S.D.W. Va.1992). The Constitution itself "vests no liberty interest in inmates in retaining or receiving any particular security or custody status as long as challenged conditions or degree of confinement is within the sentence imposed and is not otherwise violative of Constitution." *Slezak v. Evatt,* 21 F.3d 590, 594 (4th Cir. 1994)

32

(quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983)) (internal markings omitted). Because transfer of an inmate to a higher security facility does not violate a liberty interest, due process protections are not at issue. *Meachum v. Farno*, 427 U.S. 215, 225 (1976). As previously explained, work release is discretionary in West Virginia. Therefore, Jackson had no liberty interest in maintaining his participation in work release. Without a liberty interest, Jackson cannot claim a due process violation in his disciplinary procedure. *O'Bar v. Pinion*, 953 F.2d 74, 83–84 (4th Cir. 1991).

In any event, even if Jackson were entitled to due process protections, he received the protections mandated by law. In *Wolff,* the Supreme Court discussed the due process rights afforded to a prisoner facing a disciplinary charge, determining that these rights include (1) written notice of the charge; (2) a hearing at which he or she has the qualified right to call witnesses and present documentary evidence unless doing so would present an undue hazard; and (3) a written statement detailing the evidentiary basis and reasons for the disciplinary action. *See Tyler v. Hooks*, 945 F.3d 159, 168 (4th Cir. 2019) (citations and markings omitted). A disciplinary officer's decision will be upheld if there is "some evidence" in the record to the finding. *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 457 (1985). "This is an exceedingly lenient standard, requiring only 'a modicum of evidence' in order 'to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens.'" *Tyler,* 945 F.3d at 170 (quoting *Hill,* 472 U.S. at 455). *Hill* "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the [DHO]." *Id*. (quoting *Hill,* 472 U.S. at 455-56).

In this case, Jackson received six-days' notice of the hearing, was advised that he had the right to call witnesses and present evidence at the hearing, and was provided with an explanation for the finding of guilty. (ECF Nos. 95-2, 95-3). The Hearing Officer noted the testimony of Smith, who stated that her report was accurate. The report indicated that Jackson had complained repeatedly about the work he was asked to do, did not want to weed eat, and lacked effort in performing the job duties, causing Elswick to terminate Jackson's participation on the DOH inmate crew. Although Jackson claimed, for the first time, in his response to the DCR Defendants' motion for summary judgment that he was not permitted to cross-examine Smith or call witnesses, a prisoner is not constitutionally entitled to cross-examine witnesses in a prison disciplinary proceeding, *Wolff,* 418 U.S. at 567-70, nor is a prisoner's right to call witnesses absolute. *Brown v. Braxton*, 373 F.3d 501, 505 (4th Cir. 2004). "Procedural errors in disciplinary proceedings are subject to harmless error review." *Lennear v. Wilson*, 937 F.3d 257, 276 (4th Cir. 2019). Jackson contends that he was unable to examine members of the DOH's inmate crew who witnessed his fall. If this was due to the Hearing Officer's error, rather than Jackson failing to request their attendance at his hearing, such an error would be harmless, because there was no dispute that Jackson fell on the job.

The Hearing Officer indicated that he had considered the documentary evidence submitted by Jackson, which included treatment records from CAMC. The Hearing Officer found no evidence, however, that Jackson suffered an ankle injury. (ECF No. 95-3). A review of the records from CAMC demonstrates an x-ray finding that screws in Jackson's left ankle were fractured, but an x-ray finding is not the same thing as a clinical diagnosis. While Jackson's diagnoses included left leg numbness, the Hearing Officer was correct that no diagnosis of an ankle injury was made and no specific treatment for

an acute ankle injury was rendered. Ultimately, Jackson was found guilty of refusing to work, because he did not report to work after his fall on June 14, 2019, did not have permission to be absent, and was terminated by the DOH. Thus, the Hearing Officer's finding was supported by "some evidence."

Lastly, as the DCR Defendants point out, DCR Hearing Officers have been granted judicial immunity for actions they take as part of disciplinary proceedings. *See Scible v. Steward,* No. 1:08CV100, 2010 WL 933857, at * 12 (N.D.W. Va. Mar. 11, 2010). The *Scible* Court explained that certain state officials are entitled to absolute immunity from litigation "when their role in administrative adjudicatory proceedings is functionally comparable to that of a judge." *Id.* (citations omitted). Noting that DCR Hearing Officers—also called magistrates *See* (ECF No. 95-9)—are employed independently of the institutional chain of command for the purpose of hearing inmate disciplinary proceedings, the Court concluded that they were entitled to judicial immunity. Therefore, the undersigned **FINDS** that Jackson fails to state a meritorious claim against Defendant Greenwood.

### E.    Claim Against Henderson

Jackson claims that correctional officer Henderson "abused her power" by preventing him from obtaining medical care for his foot on July 8, 2019. (ECF No. 54 at 2; ECF No. 95 at 2). At his deposition, Jackson expounded on this claim, stating that Henderson prevented him from going to Health Right for a follow-up appointment because he had a hearing scheduled on his second disciplinary charge of failing to provide a urine specimen. (ECF No. 98-1 at 15-16). Jackson testified that the appointment had been scheduled to give him the results of x-rays taken at CAMC and to provide him with records regarding his urinary retention condition. (ECF No. 98-1 at 17-

18). According to Jackson, the hearing was supposed to occur the day after his appointment, but was moved up, so Henderson made him stay for the hearing. Jackson submitted an appointment slip confirming that he was scheduled to appear at Health Right on July 8, 2019 for follow up and a copy of his x-rays. (ECF No. 95-10 at 1). The records supplied by Jackson also demonstrate that this appointment was rescheduled to July 10, 2019. (ECF No. 95-10 at 3).

The evidence of record shows, at most, that Henderson's refusal to let Jackson leave on July 8, 2019 gave rise to a delay in care, rather than a denial of care. Moreover, while the reasons for the delay in medical care are disputed, the dispute is not one of material fact, because there is no evidence that Jackson suffered any consequence from the alleged delay of care. Indeed, Jackson fails to establish that he had a serious medical condition on July 8, 2019; that Henderson knew a refusal of care would place Jackson at excessive risk of harm; and that Henderson nonetheless denied Jackson care. To the contrary, the documentation indicates that Jackson was supposed to have a routine follow-up appointment, which was rescheduled to occur two days later in order to allow Jackson's presence at a disciplinary.

## IV.    **Proposal and Recommendations**

For the reasons stated, the undersigned respectfully **PROPOSES** that the presiding District Judge confirm and accept the following findings and **RECOMMENDS** that Defendants' motions summary judgment, (ECF Nos. 88, 90), be **GRANTED**; the amended complaint, (ECF No. 54), be **DISMISSED;** and this case removed from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers,

36

United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff, and counsel of record.

**FILED:** January 26, 2022

Cheryl A. Eifert
United States Magistrate Judge

37